# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF KENTUCKY
# PADUCAH DIVISION
# CASE NO. 5:10-CV-147

**CECIL ROARK, II**                                                                           **PLAINTIFF**

**v.**

**TAMMY ROBERTSON, ET AL.**                                    **DEFENDANTS**

## MEMORANDUM OPINION AND ORDER

This matter is before the Court upon Defendants' Motion for Summary Judgment (Docket #25). Plaintiff has responded (Docket #30). Defendants have replied (Docket #31). Plaintiff has filed a sur-reply (Docket #32). This matter is now ripe for adjudication. For the following reasons, Defendants' motion is GRANTED IN PART and DENIED IN PART.

## BACKGROUND

Plaintiff Cecil Roark, II, is a convicted inmate currently incarcerated at the Little Sandy Correctional Complex. He was previously housed at the Crittenden County Detention Center ("CCDC") from July 14, 2009 to November 3, 2009. On July 30, 2010, Plaintiff filed a 42 U.S.C. § 1983 action against LaDonna Thompson (Commissioner of the Kentucky Department of Corrections), Jailer Rickey Riley, Major Tammy Robertson, Deputy Jailer Bryan Hollis, and Deputy Jailer Robert Donahoo. Plaintiff alleges that these CCDC officials violated his constitutional rights. Plaintiff sues each Defendant in his/her individual and official capacity. He seeks compensatory and punitive damages.

On December 7, 2010, the Court conducted an initial review of Plaintiff's Complaint pursuant to 28 U.S.C. § 1915A and *McGuire v. Wrigglesworth*, 114 F.3d 601 (6th Cir. 1997). The Court dismissed all claims against Defendant LaDonna Thompson and all official capacity claims against the remaining Defendants. The Court allowed Plaintiff's individual capacity

claims to proceed against Defendants Riley, Robertson, Hollis, and Donahoo.

Plaintiff's Complaint arises from incidents occurring in October of 2009. On October 1, 2009, Plaintiff filed a grievance at CCDC complaining that he was being served cold food and an unidentified jail employee had made sexual remarks to him and other unidentified inmates. Defendant Riley responded to the grievance that he eats the same food, the kitchen does not know which trays go to the inmates or the jailers, and that Plaintiff's grievance was unfounded. For dinner that night, Plaintiff alleges that he was told by the jail officials that "we have a special treat for you." The officials then separated a tray from those meant for other inmates, causing Plaintiff to believe that they were tampering with his food. Defendants assert that the cook had instructed them to give Plaintiff the top tray because it was the warmest. Plaintiff threw the food away and called someone outside the institution to contact the Kentucky Department of Corrections. Plaintiff claims that approximately one hour after this phone call he was placed in the CCDC segregation unit.

According to an inmate disciplinary report dated October 2, 2009, Plaintiff was moved to an isolation cell after he threw his tray in the trash, accused the guards of spitting in his food, complained to other inmates in his cell, threatened the guards by making such statements that "he could snap her neck just the same," and held a note up to the window which stated "you're a bitch ass whore you." DN 25-5, 25-8. When Major Robertson was advised of the situation, Plaintiff was taken to isolation for a period of sixty days. After he was placed in the first isolation room, Defendants' reports indicate that Plaintiff covered the camera first with toilet paper and then with feces. He was moved to a different isolation cell and the guards report that he continued cursing and threatening them.

2

CCDC employees submitted reports which indicate that Plaintiff's threats to physically harm the guards continued the next day and he was also yelling at everyone that walked down the hall. Defendant Hollis reported on October 2, 2009, that Plaintiff told him "to tell Major Tammy Robertson that she is a good-for-nothing bitch." DN 25-14, p. 1. Defendant Donahoo reported that Plaintiff "threatened to beat the shit out of [Robertson] if he could get to her" and "begged her to open the door." DN 25, 15, p. 1. Plaintiff also kicked the window with his feet while yelling at the guards and other inmates. Later in the day, reports state that Plaintiff called a sergeant a "fat ass racist Jew", DN 25-19, and "started yelling and shaking his dick at Deputy Cindy Barnes and told her that he will rape her so bad that she wouldn't be able to get up from the floor." DN 25-20, p. 1. Deputy Jailer Jack Wells reported that Plaintiff

> pulled his pants down exposing himself to both male and female deputies. He climbed on the wall divider by the toilet and began hitting the light and the camera. He then got down, pulled his mat in front of the cell door, layed [sic] down on his back and began trying to kick the door open with both feet.

DN 25-21, p. 1.

On October 4, 2009, Lieutenant Tina Rushing reported that Plaintiff was yelling at the guards, threatening to kill and rape them. In addition, Plaintiff smeared ejaculate on the window and threw urine under the door of his cell into the hallway. On October 5, 2009, Plaintiff's behavior continued and an Extraordinary Occurrence Report was filed. According to a report filed by Defendant Robertson, Plaintiff was cursing at her and telling her that if she didn't flush his toilet he would smear feces on the window. After Robertson told him she couldn't flush the toilet from out in the hall, he said she was lying and threw feces from the toilet at the window. She instructed him to stop but he refused to comply. Plaintiff continued yelling and pushing up against the door. Robertson got her pepper spray and sprayed it into the cell. "He still did not

comply so I called for back up from MPD [Marion Police Department] and the jailer . . . ." DN 25-27, p. 2. Officers then moved Plaintiff from his cell to a detox cell where he was stripped to a pair of shorts. The officers then observed Plaintiff on the camera squatting and pulling something out of his anus. He then used this object to scratch the door and his wrist. The guards told him to push the object under the door but he refused. Eventually he slid two pieces of his watch under the door, but "you could tell he still had something that he had put down the front of his shorts." DN 25-27, p. 3.

> The deputies went in and told him to strip down so he could be searched. The deputies put him in handcuffs.[1] While he was walking up to get against the wall he shoved Jailer Rickey Riley and put a large blood blister down his right forearm, at this time Jailer Riley tazed [sic] inmate Roark for not complying and using force with the handcuffs inmate Roark had on to shove Jailer Riley. When he was tazed [sic] Inmate Roark went to floor. Probes were in his right, middle back area. We got the restraint chair to move Roark so we could clean that cell because we discovered he had cuts his wrist and slung blood on cell window.

DN 25-27, p. 3-4. While Plaintiff was sitting in the chair but not strapped down, he continued yelling and cursing at the officers.[2] Plaintiff was then moved to a holding cell where the staff nurse removed the probes from his back. The area was cleaned and bandaged. Plaintiff refused any other medical treatment. Plaintiff continued to be non-compliant and was eventually strapped into the restraint chair to prevent self harm. Defendant Robertson's report is

---

[1]Defendants' reports acknowledge that Plaintiff was compliant in being handcuffed. *See* Starkey Rpt., DN 25-28, p. 1 ("Inmate Roark was then told to place his hand[s] in the bean hole to be handcuff[ed] and he did."); Donahoo Rpt., DN 25-29, p. 1 ("Cecil agreed to be handcuffed & moved to Detox."); Hollis Rpt., DN 25-30, p. 1 ("Inmate Roark was ordered to turn around, back up to the bean slot and submit to hand restraints. Inmate Roark did comply to this order and was placed in a detox cell.").

[2]Deputy Starkey and Jailer Riley's reports indicate that a second application of the taser occurred. None of the other reports acknowledge this second application of the taser, including the Marion Police Department reports.

corroborated by reports from Defendant Donahoo, Defendant Hollis, Defendant Riley, and Deputy Starkey. The Marion Police Department report describes the incident as follows:

> Upon opening the cell door the deputies were ordered to handcuff the inmate so he could be searched. As he was turning around to get against the wall he spun around with force and struck Jailer Riley scratching his arm with the handcuffs. Jailer Riley then tased Inmate Roark causing him to fall to the floor. When he fell some more pieces of the watch was [sic] located.
>
> The inmate was then strapped down in a restraint chair and escorted to another cell because he had smeared blood on the detox cell door.
>
> Once secured the detention center nurse removed the probes and cleaned the area with alcohol and then finished by placing bandaids to the affected area.

DN 25-37, p. 1-2. Officers George Foster and Bobby West gave similar statements.

Plaintiff's account of the events of October 5, 2009, differs from Defendants' accounts concerning the conditions of Plaintiff's confinement and his compliance with orders. Plaintiff states that the toilet in the segregation unit he was placed in did not work but his complaints were ignored. Because of this, he admits he created a scene, was cursing, threw the contents of the toilet around, and tried to use his mattress to prevent pepper spray from entering his cell. After he was handcuffed, Plaintiff admits he continued to verbally complain about his treatment but he was otherwise compliant. He states that the officers taunted him. He complied with the order to move to the wall and as he did so he was tased in the back, causing him to collapse to the floor. Defendant Riley then began taunting him, calling him vulgar names and cursing at him. After he was placed in the restraint chair, while handcuffed, "Rickey Riley pulled on Plaintiff's hair calling Plaintiff names, and again tasered Plaintiff." DN 1, p. 12.

Plaintiff further alleges that following these events he attempted to get in contact with friends and family by mail to let them know about his treatment at CCDC. He also attempted to

5

contact law enforcement and other officials. "The Defendant Riley continued his taunting and abuse after the event by telling Roark that he would not send Roark's mail because he is not a 'postal worker' and is not responsible for Roark's mail." DN 30-1, p. 8.

Plaintiff alleges that Defendants violated his constitutional rights by (1) subjecting him to cruel and unusual punishment through the use of a taser while he was handcuffed; (2) retaliating against him for exercising his right to file grievances; and (3) misdirecting his mail. Defendants filed a motion for summary judgment as to all claims on June 3, 2011. The Court now considers this motion.

## STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"[N]ot every issue of fact or conflicting inference presents a genuine issue of material fact." *Street v. J. C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989). The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case. *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996). The plaintiff must present more than a mere scintilla of evidence in support of his position; the plaintiff must present evidence on which the trier of fact could reasonably find for the plaintiff. *See id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). Mere speculation will not suffice to defeat a motion for summary judgment: "the mere existence of a colorable factual dispute will not defeat a properly

supported motion for summary judgment. A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Moinette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996).

## DISCUSSION

I.  **Eighth Amendment Claims**

Plaintiff alleges that Defendants used excessive force against him in violation of the Eight Amendment's prohibition of cruel and unusual punishment. Eighth Amendment claims by prisoners alleging excessive force must satisfy a two-prong standard. Initially, prisoners must show that the guard's actions were objectively harmful enough to create a constitutional claim. Second, the prison official's act must have been committed with the requisite state of mind. *Hudson v. McMillian*, 503 U.S. 1, 7 (1992). The first "objective" component to the standard is measured with "contemporary standards of decency," *id.*, and dictates that "when prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated." *Id.* at 9. "This is true whether or not significant injury is evident." *Id.*

While the second "subjective" component does not have a fixed meaning, ultimately it is an analysis into the motivation of the action taken against the prisoner and if it was an "unnecessary and wanton infliction of pain." *Moore v. Holbrook*, 2 F.3d 697, 700 (6th Cir. 1993) (quoting *Ingraham v. Wright*, 430 U.S. 651, 670 (1977)). "[T]he question whether the measure taken inflicted unnecessary and wanton pain and suffering ultimately turns on 'whether the force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.'" *Whitley v. Albers*, 475 U.S. 312, 320-21 (1986) (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir.), *cert. denied*, 414 U.S. 1033

7

(1973)). "To determine such motivations on the part of correctional officers, courts should consider the reasons or motivation for the conduct, the type and extent of force applied, and the extent of inflicted injury." *Caldwell v. Moore*, 968 F.2d 595, 600 (6th Cir. 1992) (citing *Whitley*, 475 U.S. at 320-22).

    *A.*    *Tammy Robertson, Bryan Hollis, and Robert Donahoo*

Plaintiff's only allegation of excessive force is that he was tased twice while wearing handcuffs. Plaintiff states that Defendant Rickey Riley was the person who tased him both times. Plaintiff fails to allege that any of the other Defendants used excessive force. Accordingly, summary judgment on Plaintiff's Eighth Amendment claim is GRANTED as to Defendants Robertson, Hollis, and Donahoo.

    *B.*    *Rickey Riley*

In determining whether Plaintiff's Eighth Amendment rights were violated by Defendant Riley, the Court examines the two instances of tasing separately. As to the first tasing, the undisputed evidence shows that Plaintiff was handcuffed at the time he was tased by Defendant Riley. In addition, both parties acknowledge that Plaintiff was loud and verbally belligerent. The parties disagree over whether Plaintiff was compliant with Riley's order to move toward the wall. Plaintiff insists that he complied with this order, while Riley and other guards report that Plaintiff struck Riley on his right arm with the handcuffs. In addition to the reports, Defendants also submitted photos of Riley's forearm injury.

While the use of stun guns is not improper *per se*, *see Caldwell*, 968 F.2d at 600, "the gratuitous use of force on a suspect who has already been subdued and placed in handcuffs is unconstitutional." *Bultema v. Benzie Cnty.*, 146 F. App'x 28, 35 (6th Cir. 2005). The evidence

8

demonstrates that Plaintiff was in handcuffs at the time he was tased. However, there is also evidence that Plaintiff struck Defendant Riley with his handcuffs. Plaintiff merely states that he was "compliant," although he acknowledges that he continued to be verbally disruptive while he was handcuffed. He fails to refute Defendants' assertion that he struck Defendant Riley with the handcuffs. In addition, Plaintiff's actions were threatening to himself and others. Just prior to being approached by officers and handcuffed, Plaintiff used an item to scratch at his own wrists to the point of drawing blood. There was a danger to the officers that whatever object was in Plaintiff's possession could still be used as a weapon and Plaintiff does not dispute that he had this item in his possession at the time.

In light of the facts presented, the Court finds that the force used "was applied in a good faith effort to maintain or restore discipline." Thus, there is no genuine issue of material fact that Plaintiff's Eighth Amendment rights were not violated by the first tasing. Accordingly summary judgment is GRANTED as to the first tasing.

The circumstances surrounding the second tasing are much less clear. First, there is a question of fact as to whether a second tasing occurred.[3] Accepting the facts in a light most favorable to the Plaintiff, however, the Court analyzes this claim as if a second tasing occurred. Next, the parties dispute the circumstances of the second tasing. Plaintiff asserts that, after the first tasing, "Plaintiff was placed into a chair handcuffed, [and] Rickey Riley pulled on Plaintiff's hair calling Plaintiff names, and again tasered Plaintiff." DN 1, p. 12. In contrast, Deputy Starkey's report indicates that Plaintiff was sitting in the chair but not strapped down,

---

[3]Plaintiff claims that he was tased for a second time while sitting in the restraint chair. Defendants argue that no additional prongs were placed on Plaintiff's person, although a second current may have been used to bring him into compliance.

and he was "yelling and cursing and was tazed [sic] again." DN 25-28, p. 2. Defendant Riley's report indicates that an additional application of the taser was necessary because Plaintiff continued to yell and was non-compliant. None of the other reports, including the Marion Police Department reports, acknowledge a second application of the taser. Viewing the evidence in a light most favorable to Plaintiff, he was handcuffed and seated at the time he was tased for a second time. Moreover, Defendant Riley was taunting him and pulling his hair. Accordingly, the Court finds that there is a genuine issue of material fact as to whether a second tasing occurred and whether such force was applied "maliciously and sadistically for the very purpose of causing harm." *Whitley*, 475 U.S. at 320-21. Accordingly, summary judgment as to this claim is DENIED.

## II.     First Amendment Claims

### A.     *Segregation*

Plaintiff argues that Defendants retaliated against him for exercising his First Amendment rights by placing him in a segregation unit with a toilet that did not function properly. To prevail on a First Amendment retaliation claim, "a prisoner must prove that (1) he engaged in protected conduct, (2) the defendant took an adverse action that is capable of deterring a person of 'ordinary firmness from continuing to engage in that conduct,' and (3) 'the adverse action was motivated at least in part by the [prisoner's] protected conduct.'" *Hill v. Lappin*, 630 F.3d 468, 472 (6th Cir. 2010) (quoting *Thaddeus-X v. Blatter*, 175 F.3d 378, 394, 398 (6th Cir. 1999) (en banc)).

Conduct protected under the First Amendment "includes a prisoner's 'undisputed First Amendment right to file grievances against prison officials on his own behalf.'" *Id.* (quoting

*Herron v. Harrison*, 203 F.3d 410, 415 (6th Cir. 2000)). "If the grievances are frivolous, however, this right is not protected." *Id.* (citing *Herron*, 203 F.3d at 415).

On October 1, 2009, Plaintiff filed a grievance concerning the prison food and sexual harassment. Specifically, Plaintiff's grievance complained that the food was cold and that an unidentified prison official made unspecified sexual comments to an unidentified group of inmates. Defendants argue that the same food is served to the Jailer, staff and inmates, and thus, Plaintiff's grievance was frivolous. Further, Defendants believe Plaintiff's sexual harassment claim was too vague and ambiguous such that it was meritless. Claims generally considered frivolous are those that lack "an arguable or rational basis in law or fact." *McClaine-Bey v. Spicer*, 3 F. App'x 342, 343 (6th Cir. 2001). Viewing the evidence in a light most favorable to the Plaintiff, the Court cannot say that Plaintiff's grievance was frivolous. There is a genuine issue of material fact as to whether his complaints had any factual basis.

Next, Plaintiff must establish that Defendant took adverse action against him that was capable of deterring him from engaging in the same conduct in the future. The alleged adverse action in this case is that Plaintiff was placed in a "suicide watch" segregation cell with a dysfunctional toilet. Taking the facts in a light most favorable to Plaintiff, the Court finds that placing Plaintiff in a segregation cell intended for mentally disturbed patients and equipped with a non-functioning toilet would qualify as "an adverse action that is capable of deterring a person of 'ordinary firmness from continuing to engage in that conduct . . . .'" *Hill*, 630 F.3d at 472 (quoting *Thaddeus-X*, 175 F.3d at 394).

Finally, Plaintiff must establish that the adverse action was motivated, at least in part, by Plaintiff's protected conduct. Plaintiff asserts that he was moved to the segregation cell only a

short time after he filed his grievance and made contact by telephone with someone outside the prison about his conditions of confinement. In contrast, Defendants assert that Plaintiff was moved to the segregation unit after he threatened to "knock a guard in the head" and held a note up to the window which stated "you're a bitch ass whore you." DN 25-5, 25-8. The Inmate Disciplinary Report also states that Plaintiff said he could snap one of the guard's necks. Defendant Robertson was informed of Plaintiff's conduct and then Plaintiff was taken to an isolation cell.

"If the defendant can show that he would have taken the same action in the absence of the protected activity, he is entitled to prevail on summary judgment." *Thaddeus-X*, 175 F.3d at 399. Defendants have offered evidence of Plaintiff's verbal abuse and threats which Plaintiff does not deny. A copy of the note Plaintiff wrote is contained within the record. Further, there were additional inmates in the cell speaking to Plaintiff about his plans to "thump some guards heads." DN 25-6, p. 2. Again, Plaintiff never disputes that he made these statements. The Court finds that Defendant has presented enough evidence to demonstrate that, in light of Plaintiff's threatening behavior, Plaintiff would have been moved to a segregation unit in the absence of Plaintiff's protected activity. Accordingly, summary judgment is GRANTED as to all Defendants on this claim.

    *B.    Mail*

Finally, Plaintiff alleges that Defendants failed to send his mail out from CCDC. Plaintiff asserts that he was trying to communicate with friends, family, and investigative officials following the events of October 5, 2009. Plaintiff states in his Complaint:

> As this Court will notice, the Plaintiff wrote the Federal Court attempting to get attention to the problems immediately, including the mail problems. Where

> Rickey Riley, refusing to mail out Plaintiff's mail be cause [sic] he (Rickey Riley) is not a postal worker. This is a violation of Plaintiff's United States [ ] Constitutional rights highlights the arrogance displayed by Rickey Riley in his official capacity and his individual capacity. Plaintiff's efforts to find attention was ambushed by Rickey Riley in a manner only one with the arrogance of authority could manage. The letter Rickey Riley refused to mail out was addressed to the Federal District Court alerting the Court of the abuse that was currently taking place in that Detention Center.

DN 1, p. 14-15. For Plaintiff to get his mail out, he states in his response brief that he had to ask other inmates to send his mail out in their mail. Plaintiff also submitted a notarized letter from his uncle, Frank Gagliardi, which states:

> I, Frank Gagliardi . . . state that from October 1st through November 3rd of 2009 Mr. Cecil Roark [ ] had to send his mail to me from other inmates because his mail was not coming to me.
>
> Mr. Roark sent a grievance about Jailer Rickey Riley to me so I could make copies and send them back to Mr. Roark, he never received them.

DN 30-2, p. 1. Plaintiff again asserts in his response brief that at least one of the letters he sent through another inmate was directed to this Court, "setting out his complaints hoping a Federal Court Judge could do some type of investigation of the situation." DN 30-1, p. 24.

Defendants assert that Plaintiff was not prevented from sending mail from CCDC. According to Defendants, the policy at CCDC is for the deputies who check the cells every hour at CCDC to collect mail from inmates and place the mail in booking. Jailer Riley does not personally collect inmate mail. Thus, Defendants assert, if an inmate had requested Defendant Riley to personally mail an item for him, the inmate would be directed to give his mail to a deputy instead. The Court notes that Defendants merely make these assertions in their reply brief; there is no documentary or testamentary evidence detailing CCDC's mail procedures.

"A prisoner has a First Amendment right to send mail." *Rodgers v. Hawley*, 14 F. App'x

403, 408 (6th Cir. 2001) (citing *Hudson v. Palmer*, 468 U.S. 517, 547 (1984)). Interference with this right is only permitted if such interference is "'reasonably related to legitimate penological interests.'" *Id.* (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)). In this case, Defendants assert that they did not interfere with Plaintiff's right to send mail. Plaintiff asserts otherwise and presents a letter from his uncle affirming his claims. Thus, there is a genuine issue of material fact as to whether Plaintiff's First Amendment right to send mail was violated. Plaintiff has only alleged, however, that Defendant Riley interfered with this right. His Complaint fails to allege that the remaining Defendants acted in any way to prevent him from sending out mail. Accordingly, the motion for summary judgment as to this claim is DENIED as to Defendant Riley and GRANTED as to Defendants Robertson, Hollis, and Donahoo.

## CONCLUSION

For the foregoing reasons, IT IS HEREBY ORDERED that Defendants' Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART.

Defendants Robertson, Hollis, and Donahoo are hereby DISMISSED as parties to this action.